**KENOSHA AUTO TRANSPORT CORPORATION, Plaintiff,**

v.

**ALGOMA CENTRAL RAILWAY; M/V AGAWA CANYON, her Engines, Boilers, etc.; Morelli Overseas Export Service of Wisconsin, Inc.; S.L.T., Inc.; Starline Trucking Company; Morton-Norwich Products, Inc.; Standard Steamship Owners' Protection and Indemnity Association (Bermuda) Limited; Zurich Insurance Company; Orion Insurance Co., Ltd.; Yasuda Insurance Co., Ltd.; Indemnity Marine Co., Ltd.; Commercial Union Assurance Co., Ltd.; Threadneedle Insurance Co., Ltd.; Home Insurance Co.; International Insurance Co.; Philip Alan Froude, and Underwriting Members of Lloyd's Subscribing to Policy Number 35–SL0046, Defendants,**

and

**Atlantic Mutual Insurance Co., Intervening Defendant.**

**Civ. A. No. 81–C–1171.**

United States District Court, E.D. Wisconsin.

Dec. 14, 1983.

As Corrected Dec. 21, 1983.

Milwaukee, Wis., for plaintiff, Kenosha Auto Transport Corp.

Theodore C. Robinson, Ray, Robinson, Hanninen & Carle, Chicago, Ill., and Ward Werner, Milwaukee, Wis., for defendants, Algoma Cent. Ry., M/V Agawa Canyon, her engines, etc., and Standard Steamship Owners' Protection and Indem. Ass'n (Bermuda) Limited.

David E. Leichtfuss, Michael, Best & Friedrich, Milwaukee, Wis., and Malcolm B. Rosow and Arthur J. Leiderman, Standard, Weisberg, Heckerling & Rosow, P.C., New York City, for defendants, Philip Alan Froude; Orion Insurance Co., Ltd., Yasuda Ins. Co. (UK) Ltd., Indem. Marine Co., Ltd., Threadneedle Ins. Co., Ltd., and Commercial Union Assur. Co., Ltd.

Jeffrey A. Schmeckpeper, Kasdorf, Dall, Lewis & Swietlik, S.C., Milwaukee, Wis., for defendant, Morelli Overseas Export Service of Wisconsin, Inc.

Thomas H. Knoll Piette, Knoll & Nelson, and Harney B. Stover, Davis & Kuelthau, S.C., Milwaukee, Wis., for defendants, S.L.T., Inc., Starline Trucking Co., and Home Ins. Co.

Donald E. Mayew, Phillips, Richards, Lepp, Mayew & O'Connor, Kenosha, Wis., for defendants, Morton-Norwich Products, Inc., and International Ins. Co.

James T. Murray, Arnold, Murray, O'Neill & Schimmel, Milwaukee, Wis., for defendant, Zurich Ins. Co.

Ralph K. Rosenbaum, Jr., deVries, Vlasak & Schallert, S.C., Milwaukee, Wis., for intervening defendant, Atlantic Mut. Ins. Co.

## FINDINGS OF FACTS, CONCLUSIONS OF LAW AND DECISION AND ORDER

REYNOLDS, Chief Judge.

This is an action in tort and in contract arising out of the collapse of a dock at the Port of Kenosha. The dock collapsed under the weight of approximately 20,000 tons of salt. The plaintiff Kenosha Auto

William R. Steinmetz, Reinhart, Boerner, Van Deuren, Norris & Reiselbach, S.C.,

Transport Corporation owns the dock and has brought this action for damages to recover the moneys it spent to clean the harbor of debris and to repair its dock. The plaintiff has sued the operator of the dock, the carrier vessel that unloaded the salt cargo, the owner of the cargo, and the trucking firm that received and transported the salt to a permanent storage site. Each defendant has cross claimed against the other for contribution. Additionally, Atlantic Mutual Insurance Company, which indemnified the owner of the salt for its property loss, has brought claims against every party as an intervening defendant to recover that loss.

This court has admiralty and maritime jurisdiction under 28 U.S.C. § 1333 to hear at least the claims lodged against the carrier vessel. The claims asserted against each of the other parties are properly before the Court under either its admiralty or its pendent jurisdiction.

On October 3, 1983, a trial to the Court in this matter was commenced. The issues as to each party's insurance coverage were severed from trial and reserved for later determination. In the matter at bar, the Court is asked to decide which parties are legally responsible, either in contract or in tort, for the damages sustained as a result of the collapse. The Court must determine what sum in damages is reasonable and, if more than one party is found liable, what share of the cost each party is to bear. The matter was taken under advisement on October 13, 1983. The following constitutes my findings of fact and conclusions of law.

1. On June 10, 1981, Kenosha Auto Transport Corporation ("KAT"), a wholly-owned subsidiary of the Jupiter Transportation Company ("Jupiter"), owned dock property which stretched for approximately 1,863 lineal feet along the south side of Kenosha Harbor which is an east-west channel inlet from Lake Michigan. This property is held out to the public as the Port of Kenosha. The property was originally acquired by Jupiter in 1964 when Jupiter purchased all the assets of several affiliated companies, including the Kenosha Harbor Development Corporation which then owned the dock property. The entity that purchased the dock property was Jupiter Kenosha, a subsidiary of Jupiter Transportation Company. Sometime after the purchase of the dock property, Jupiter Kenosha, Inc., was renamed KAT. KAT is primarily engaged in the business of overland transportation of cars, trucks, and boats.

2. KAT operated the dock from the time it purchased the dock on June 1, 1964 until March 31, 1967. During that time, KAT leased the premises adjacent to the dock property to Morelli Overseas Export Services of Wisconsin, Inc. ("Morelli"). From March 31, 1967, until after the collapse of the dock on June 10, 1981, Morelli leased from KAT both the premises adjacent to the dock property and the dock itself. On June 10, 1981, Morelli held the dock property under a one year lease from KAT.

3. On June 11, 1980, Morton-Norwich Products, Inc. ("Morton") entered into a contract with Algoma Central Railway ("Algoma") whereby Algoma would deliver salt owned by Morton to various Great Lakes ports. Sometime in late 1980 or early 1981, S.L.T., Inc. ("SLT") and Morton began negotiations to arrange for dock space for the delivery of Morton's salt, a permanent storage site for the salt, and the transportation of the salt from the dock to the permanent storage site.

4. SLT entered into a contract, dated March 27, 1981, with Morelli whereby Morelli set aside a portion of its dock for the reception and temporary storage of Morton's salt. This has been referred to as a "lease" but was more akin to a through-put agreement. More specifically, Morelli allowed SLT to use a 100 by 400 foot area of the dock for twenty consecutive days of the year as a storage area for cargo to be discharged from a vessel and to be moved almost immediately by a third party consignee. Morelli, of course, had access to the entire dock while SLT was using it.

5. SLT's "sublease" agreement with Morelli contained two indemnity provisions. Paragraph 4 provided:

S.L.T. shall indemnify and hold Lessor [Morelli] harmless from and against any and all damage, loss, liability, cost, expenses, claim or demand or account of any injury to or death of any person, or injury to or loss of any property, however caused, resulting from or arising in connection with or from the performance or nonperformance by S.L.T. of its obligations hereunder or the maintenance or operation of the Subject Location. S.L.T. shall maintain and keep in force, at its own expenses, all such forms of insurance, including, but not limited to, general public liability and contractual liability against claims for bodily injury, death or property damage and Worker's Compensation.

Paragraph 17, added at the end of the agreement, contained identical language and imposed a reciprocal obligation running from Morelli to SLT. I find from the evidence adduced at trial that paragraph 4 was meant to require SLT to indemnify Morelli for damages caused by SLT's own negligence; conversely, paragraph 17 was intended to require Morelli to indemnify SLT for injuries resulting from Morelli's own negligence.

6. SLT also contracted with R.R. Birdsall & Sons, Inc., for use of a permanent storage site for the salt. Starline Trucking Corporation ("Starline") was to haul the salt from the dock to the permanent storage site. SLT and Starline are separate corporate entities even though each has Michael O'Kane as its owner and president. SLT was separately incorporated to function simply as a terminal operation and thus to avoid regulation as a motor carrier.

7. After Morton approved the arrangements made by SLT, Morton and SLT entered into a contract dated April 21, 1981. The contract called for 40,000 tons or more of salt to be received at the Morelli dock and then transported to the permanent storage site.

8. A Morton employee visited the Kenosha dock in March of 1981 to see if the size and quality of its surface area was adequate to meet the company's unloading and storage needs. No investigation of the dock's structural capacity or anchorage system was made by Morton.

9. Morton's salt was delivered to the Kenosha dock in two shiploads. The first delivery of 21,250 tons was made on May 22, 1981, by the "Algorail," a vessel owned by Algoma. This shipment was discharged onto the dock and transported to the permanent storage site without incident. The marine vessel "Agawa Canyon," also owned by Algoma, arrived in Kenosha Harbor with the second delivery of 20,620 tons of salt on June 10, 1981.

10. Michael O'Kane, President of SLT and Starline, was informed by Morton of the arrival date of the ship into Kenosha Harbor for the May 1981 unloading. Mr. O'Kane then contacted Mr. Robert Smith, the Kenosha County surveyor, to have Mr. Smith survey the salt to be discharged in May 1981 to be sure that SLT was receiving the amount of salt that Starline was to transport for stockpiling and ultimate distribution. O'Kane was present at the dock when the first shipment arrived. He denies having instructed the ship either where or how to unload the salt.

11. Mr. O'Kane was also informed by Morton of the date of the arrival of the ship into Kenosha Harbor for the June 1981 unloading of salt. He was present during a portion of the unloading process. O'Kane denies telling the ship where to dock in June but admits instructing the ship to move the salt pile farther from the water line.

12. Both the May and June deliveries were unloaded in the general area designated by Morelli for use by SLT to receive the salt.

13. The Agawa Canyon is a Great Lakes steel bulk cargo self-unloading ship built by Collingwood Shipyards, Collingwood, Ontario, in 1970. The ship is 646'6" in length overall, 72' wide, and has a molded depth of 40'. The ship's self-unloading

equipment consists of a boom 250' in length with a 60" wide belt. The hinge point of the boom is 93' from the stem or front end of the ship. The ship has four cargo holds and seventeen cargo hatches. The ship's holds are constructed with sloping sides which direct the cargo onto endless belts in tunnels underneath the holds which carry the cargo toward the forward or front end of the vessel. The cargo moves off these belts onto elevating machinery which carries it up and dumps it onto an endless belt on the boom which then carries it to a discharge spout on the end of the boom.

14. On June 10, 1981, the vessel Agawa Canyon delivered its shipload of 20,619 tons of salt to the Kenosha dock. At or near the end of the unloading process on June 10, with substantially all of the salt deposited on the dock, a portion of the dock suddenly collapsed, pushing the Agawa Canyon out into the channel.

15. The Agawa Canyon arrived at the Kenosha Harbor on June 10, 1981, and without tug assistance pulled up to the dock at 1:05 P.M. in the location where she had docked for the May salt delivery, toward the western end of the dock adjacent to the area designated for salt unloading. The captain of the vessel had been to the dock with an earlier shipment of salt, and he knew where to dock and where the unloading area was.

16. When the ship had docked, an unidentified gentleman was waiting on shore. Everyone on the vessel assumed this man was the dock superintendent. A crew member asked him where to start unloading, and the unknown man indicated they could begin anywhere on the unloading pad.

17. It was customary for self-unloading salt ships like the Agawa Canyon to dock and unload without dock assistance. This essentially was true here. Morelli's dock superintendent Robert Piff was at the dock on June 10, 1981. He is responsible for knowing which dock areas are designated for which purposes. He usually tells ships' crews where to dock and unload, but on June 10, 1981, he did not have to inform the Agawa Canyon. Mr. Piff did not tell the vessel's crew where to dock, where to unload, or how to unload. He periodically looked to see if the pile remained within the designated area until he left the dock at 5:20 P.M. while the ship was still unloading. He did not supervise the unloading or complain that the salt pile was too close to the edge of the dock.

18. At 1:15 P.M. on June 10, 1981, the ship's crew began discharging the salt in the center of the 100 by 400 foot unloading pad where the unloading boom happened to be positioned. The salt was unloaded in an elongated pile. The ship used its winches to move at first westward along the dock while unloading, with the crew using its judgment in monitoring the pile's height and shape. The ship gradually moved westward while unloading until it ran aground approximately two hours later. The unloading was halted and the ship winched eastward off the bottom. The ship travelled backward until it reached the east end of the salt pile in the middle of the unloading area. From this point the ship recommenced unloading the salt, moving slowly eastward until the unloading was completed.

19. The gentleman presumed by the ship's crew to be a Morelli dock superintendent patrolled the southern boundary of the unloading area during the process, signaling to the vessel when the salt pile had reached far enough back. The crew could not see the back edge of the pile. When the toe of the pile had reached the southern boundary of the unloading area, the boom would shift to begin another peak and the ship would be winched along the dock. The man on shore did not tell the ship's crew how far east, how far west, or how close to the water to discharge the salt.

20. By 6:05 P.M. the stream of salt emanating from the ship had slowed to a trickle; for all practical purposes, the ship had discharged all of its salt. Very soon thereafter, the dock collapsed, pushing the eastern most end of the ship (the front or bow) outward into the harbor. At 6:25 P.M., the entire ship shifted back clear of

the dock. The Agawa Canyon backed out of the harbor and left Kenosha at 7:50 P.M.

21. The salt pile at the time of the collapse consisted of a series of cone shaped mounds forming an elongated pile averaging 35 feet high, 286 feet long, and 116 feet wide. The southern toe of this pile was flush against what remained of the south wall of the old warehouse; in June 1981, a one to two foot wall marked the southern and western sides of that building's foundation. The northern toe of the salt pile was irregular and varied in distance from the dock wall at the water's edge. For the most part, the pile was between ten and fifteen feet from the dock wall. At no point was the salt piled against the hull of the ship. In all material respects, the June 10, 1981, salt shipment was discharged in a perfectly normal fashion, just as it is customarily done by self-unloading salt vessels.

22. The configuration of the June 10, 1981, salt pile differed slightly from that formed by the 20,000 ton discharge on May 22, 1981. Because the Agawa Canyon ran aground at the west end of the dock, the June pile was shorter in length, wider in width, and situated closer to the face of the dock wall. Both piles were approximately the same height.

23. The dock area designated by Morelli for the salt unloading, and designated to SLT for that purpose, encompassed an area once occupied by a long building situated not quite parallel to the face of the dock and generally within about twenty feet of the face. The eastern end of the building stood about four stories high; the western half to three-quarters of the building was one story. The building was built in stages between about 1919 and 1946 and was used to store palletized cargo such as flour and animal hides. The dock area once occupied by this building is known as the "hide farm" area.

24. The earliest known dock wall and anchorage system on the south side of Kenosha Harbor were constructed in 1918 with part of the dock wall consisting of so-called "Wakefield" sheeting made of wood. The Wakefield sheeting was anchored by means of forty foot steel tie rods to a back anchorage system of wood piles.

25. In 1946 the dock was reconstructed with a new steel sheetpile dock wall and anchorage system installed. At the time of the 1946 reconstruction, the Wakefield dock was not removed. Rather, the new dock wall was placed to the water side of the Wakefield dock wall. The anchorage system installed in 1946 extended back from 12 to 25 feet inland of the dock wall for that portion of the dock which was adjacent to the old building, mentioned above, due to the presence of the building foundation. The remainder of the anchorage system installed at that time extended back approximately 40 feet inland of the dock wall.

26. In 1960 the steel sheetpiling dock wall, installed in 1946, was removed and was replaced with new and longer steel sheetpiling which was welded to the same back anchorage system installed in 1946. This was the dock that was in place on June 10, 1981. In short, it was comprised of a steel sheetpile dock wall driven into the ground beneath the dredge line of the harbor anchored by an anchorage system comprised of tie rods which were bolted to the bulkhead and stretched back into the dock where they were connected with wooden anchor piles.

27. The subsoil supporting the dock was very soft and silty; this material has very weak adhesion strength, especially when saturated with water, and was incapable of sustaining heavy dock surcharges. Strong, dense sand and gravel were present 42 feet beneath the surface but were too deep to offer support for the 35 foot timber anchor piles.

28. As with any dock, the back anchorage system was buried and the type of construction used in the back anchorage system, the condition of the elements of the back anchorage system, the nature of the soil encompassing the back anchorage system, and the distance between the dock wall and the back anchorage system were

not determinable by visual inspection of the surface of the dock.

29. The plaintiff's dock collapsed because too much weight was placed too close to the dock wall. The weight of the salt on the dock brought about a phenomenon known as slip circle failure. This phenomenon occurs when a weight situated near the edge of an embankment exerts a downward force sufficient to overcome the adhesive strength of the soil. A portion of the earth slips outward toward the water, the direction of least resistance, along a semicircular path, resulting in a circular sheer.

30. The entire salt load was discharged precisely where the old warehouse once had stood—the hide farm area. The structural support for this area consisted of the 1960 steel sheetpiling dock wall onto which were welded the 12 to 25 foot tie rods installed in 1946. These 1946 tie rods extended from the dock wall to the foundation of the old warehouse, which in 1946 was still standing. This small anchorage system, for the most part, was the only supporting structure under the hide farm area.

31. Encapsulated within this reinforced 1946 system was a much more ancient anchorage structure erected in approximately 1918. A wooden Wakefield sheetpiling was found intact behind the steel wall. Extending landward from this wooden dock wall were 40 foot tie rods running beneath the entire hide farm area and probably pre-existing the old warehouse. Many of these longer tie rods had been heavily corroded by an acidic substance produced when cinders in the subsoil mixed with moisture. It is uncertain whether this ancient structural system offered any significant support to the modern day loads imposed on the dock.

32. In any event, the 20,000 tons of salt deposited on the dock on June 10, 1981, was entirely too heavy for the short 12 to 25 foot tie rod system which was anchored completely in the soft, silty stratum of subsoil. As a result, the whole 1946 anchorage system slipped into the harbor, with the steel sheetpiling bending into the water. The tie rods and timber anchor piles simply slid outward while intact. The steel piling was the only element of the structure driven into the dense clayey subsoil; the base of the piling thus held firm as the upper portion bent outward.

33. The shorter 1946 anchorage system was plainly inadequate and unsuitable to sustain bulk loads of this nature. In practical effect, that anchorage system functioned not as a true dock but as little more than a retaining wall for the silty soil. It might well have been the older 40 foot tie rod system that, although corroded, kept the May shipment of salt from collapsing the dock. The June load, discharged in a wider pile and placed closer to the dock wall, was heavy enough to snap several of the weakened 40 foot tie rods of the old Wakefield dock.

34. None of the parties had actual knowledge of the dock's structural deficiencies; to the eye, the dock was covered with an asphalt surface and looked solid. Moreover, although it was common knowledge in the shipping and receiving industry that bulk loads of salt had collapsed docks on previous occasions, it likewise was common knowledge that bulk loads of salt as much as 20,000 tons in weight had been discharged at the Kenosha harbor without collapsing the dock there.

35. None of the parties undertook an actual investigation of the structural integrity of the Kenosha dock prior to the June 10, 1981, salt shipment; further, no party to this action inquired prior to the collapse whether the dock's anchorage system could sustain the June salt load or whether the dock capacity even had been investigated by others. In essence, each party to the action assumed that the dock was suitable to sustain the June 10, 1981, salt shipment. The defects existing in the dock's structural support were hidden.

36. From 1967 until June of 1981, Morelli operated the Kenosha dock as a wharfinger under a lease with KAT. During this period KAT, in practical terms, was an absentee landlord. KAT neither operated the dock facilities, nor did it oversee, supervise, or review Morelli's operation of the

dock. KAT did not discuss with Morelli the kinds or sizes of loads that may be received at the dock.

37. The lease between Morelli and KAT did not restrict the use of the dock to loads of a particular kind or size, and did not require Morelli to inform KAT when cargoes were received. Rather, paragraph 1.04 provides:

> Lessee agrees to use the demised premises and improvements thereon solely for warehouse and storage purposes, for loading and dispatching cargoes from ships and other vessels, and for transshipment of cargoes in connection with incoming and outgoing cargoes of and for ships on the Great Lakes or St. Lawrence Seaway traffic. It is understood and agreed that Lessee shall at all times during the terms hereof continuously carry on the above-described business diligently, assiduously and energetically, all in accordance with sound business practices; and to that end Lessee shall at all times maintain adequate personnel and equipment, operate during all hours customary for port operators and devote adequate space and facilities for the handling of such traffic.

Because of this lease language and because KAT never warned of the dock's structural capacity, Morelli assumed throughout its operation of the facility that it had leased a dock that was suitable for all general stevedoring activities, including the receipt of bulk cargoes. KAT, for that matter, assumed the same.

38. Article 4 of the lease deals with maintenance of the dock and provides in pertinent part as follows:

> 4.01. Lessee represents that it has examined the premises and all buildings and improvements thereon, and accepts the same in their existing condition. No representation or warranty, express or implied, has been made by or on behalf of Lessor as to such condition, or as to the use that may be made of such property. In no event shall Lessor be liable for any defect in the premises or any buildings or improvements thereon or for any limitation in the use of such property.

> 4.02. Lessee covenants it will at all times during the term keep and maintain the premises including improvements now upon the premises and any other improvements made by Lessor or Lessee upon the premises in good order and repair, free and clear of all liens of mechanics and materialmen, in order that the security furnished by the improvements for the covenants herein contained shall not at any time be impaired or diminished in value and in order that said premises may be surrendered up in good order and repair upon the termination hereof, reasonable wear and tear excepted.

39. Further, although the lease requires Morelli to keep the dock in good repair, it also gives the lessor, KAT, the option to enter onto the premises to make the repairs and to demand reimbursement of such costs with interest from the lessee. The lease does not specifically require, or permit the lessor to demand, that the lessee post bond to guarantee reimbursement for repair expenses.

40. Paragraph 10.04 of the lease prohibits the lessee from subletting the premises without the lessor's express advance written consent.

41. Finally, in its lease with KAT, Morelli covenanted that it would "protect, indemnify and forever save and keep harmless Lessor [KAT] and the premises of, from and against any and all ... loss ... arising or in any way growing out of: ... [a]ny accident, injury, loss or damage resulting to person or property, during the term of this Lease, and due directly or indirectly, to the possession, use, occupancy [or] operation, ... of the premises, or by reason of any act or thing done upon said premises." Lease Agreement, at ¶ 3.03(e).

42. Because of the deteriorating condition of the old warehouse building, KAT was ordered in February of 1972 to repair or raze the structure. As required by its lease, Morelli asked KAT's permission to raze the building at Morelli's own expense.

Morelli sought permission to raze the building because its usefulness had diminished and because its demolition would open up additional dock space. That permission was given, and the building was torn down in 1973.

43. From 1967 to 1973, when the old warehouse was razed, the eastern end of the dock was used to receive cargo. That cargo was of a general or palletized type rather than a bulk commodity. Sometime between 1978 and 1980, Morelli occasionally began receiving bulk cargoes at the dock. The bulk loads were discharged in the hide farm area where the warehouse had been. These cargoes would have to be stored on the dock for a month or more at a time, and placement in that area would not interfere with normal dock operations.

44. Morelli did not notify KAT when Morelli began to receive bulk cargoes. Morelli regarded the receipt of bulk loads as a normal stevedoring operation authorized under the lease with KAT, which lease did not otherwise restrict the types of cargoes brought onto the dock.

45. Because the collapse obstructed navigation in the channel, the United States Army Corps of Engineers ordered KAT on June 15, 1981, to restore immediately the navigation channel to its original precollapse condition. KAT immediately asked Morelli, in accordance with the lease agreement, to take steps to prevent erosion of the collapsed area and to repair the dock. Morelli assured KAT that action would be taken, but nothing was done. On June 18, 1981, KAT advised Morelli by letter that unless Morelli commenced repair work immediately, KAT would make the repairs and charge the cost thereof to Morelli. Paragraph 14.01 of the lease agreement gave KAT this option.

46. When Morelli did not immediately begin the necessary repairs, KAT retained a registered professional engineer to supervise the cleanup and to design and supervise the reconstruction of the dock. On June 25, 1981, KAT hired Gillen & Company to effect the cleanup of the harbor; that work began on June 29, 1981. Bids for the reconstruction of the dock were received on or about September 1, 1981, and thereafter the contract for reconstruction of the dock was awarded by KAT to Gillen & Company.

47. The Gillen & Company bid for the dock cleanup and restoration was accepted as the low bid on October 1, 1981, and the work was completed by late December 1981. In hiring Gillen & Company to perform the work and Klug & Smith to design a new dock, KAT did not set a budgetary limit or other specific guidelines for the repair and reconstruction of its facility. KAT concedes that as a result of the harbor cleanup and dock reconstruction, it has a better dock; the new facility is more than merely the functional equivalent of the dock prior to its collapse. Nevertheless, in the circumstances of this case, the harbor cleanup and dock repair were undertaken in the most reasonably cost-effective manner.

48. KAT paid for both the restoration of the waterway and the dock reconstruction. The cost of the restoration of the waterway was $347,672.73. The cost of the reconstruction of the dock was $375,997.37.

49. According to the bills of lading, 21,252 tons of salt were shipped to Kenosha on May 22, 1981, and 20,619 tons were shipped on June 10, 1981.

50. For the purpose of calculating the amount of salt lost in the collapse, the Court finds that the entire salt load of June 10, 1981, had been discharged before the incident. The June 16, 1981, survey reveals that the dock collapse resulted in a net loss of 7,627.41 tons of salt by Morton. Morton's insurer, Atlantic Mutual, paid for this salt at a price of $13.19 per ton, a price that the parties agree was reasonable. The total dollar loss to Atlantic Mutual, including the value of the salt and other expenses, is $102,789.04.

51. On September 28, 1981, KAT terminated its lease with Morelli for default of lease conditions. Specifically, the lease was terminated because, despite its re-

quests, KAT had received no indication of Morelli's intention either to repair the dock or to post bond to guarantee payment for such repairs.

52. Prior to Jupiter Kenosha, Inc.'s purchase of the dock in 1964, it had the opportunity to inspect the dock. Jupiter Kenosha did not exercise that right. Mr. C.R. Nicolazzo was employed by Jupiter Kenosha from 1964 to 1966. Mr. Nicolazzo had designed the work done on the dock in 1960. No one from Jupiter Kenosha ever discussed the load-bearing capabilities of the dock with Mr. Nicolazzo or examined the dock plans to determine the load-bearing capacity of the dock. Jupiter Kenosha did not set up a maintenance schedule, impose setback requirements, load limits, or type of cargo limits while it operated the dock from 1964 to March 1967. Morelli operated the dock from April 1967 to June 10, 1981. At no time between April 1, 1967 and June 10, 1981, did Morelli Overseas inquire about or did KAT impose load limitation or setback requirements on cargo received at or shipped from the dock.

53. At no time between April 1, 1967 and June 10, 1981, did Morelli Overseas inquire about or did KAT limit the type or weight of cargo which Morelli Overseas could receive or ship from the dock.

54. At no time between April 1, 1967 and June 10, 1981, did KAT require or request that Morelli Overseas determine whether or not cargo received at or shipped from the dock should be restricted to certain types or weights, or whether load limitations or setback requirements should be imposed on the dock, nor did Morelli Overseas or KAT ever independently attempt to make such determinations.

55. KAT had access to architectural drawings and plans which would have disclosed the structural history of the Kenosha dock and its anchorage system. KAT neither studied those plans nor made them available to its lessee Morelli. Likewise, Morelli did not ask for or inquire about any such plans.

■ 56. Algoma, Morton, SLT, and Starline are not legally responsible for any injuries suffered by KAT as a result of the Kenosha dock collapse on June 10, 1981. Algoma, Morton, SLT, and Starline were not negligent in regard to any actions or omissions relating to the dock collapse, including but not limited to the transportation, receipt, and unloading of the June 10, 1981, salt shipment as well as any failure to know, investigate, or inquire as to the dock's structural capacity to receive that salt shipment. In their acts or omissions relating to the collapse of the plaintiff's dock, each of these four defendants exercised reasonable care under the circumstances. Their acts or omissions are not rendered unreasonable by any knowledge they might have had regarding the collapse of other docks under the weight of salt cargoes.

57. Algoma, Morton, SLT, and Starline, for the same reasons, are not legally responsible for any damages incurred by Atlantic Mutual as a result of the dock collapse and the consequent loss of salt on June 10, 1981.

58. Insofar as Algoma, Morton, SLT, and Starline have not breached any duties they may have owed to KAT and to Atlantic Mutual, it is unnecessary to decide the issues bearing on vicarious liability; namely, whether SLT or Starline was the agent of Morton, and whether SLT is the alter ego of Starline.

■ 59. Morelli breached its duty to KAT by failing to exercise ordinary and reasonable care to preserve and protect the dock. As wharfinger of the dock, Morelli actually operated the facility from day to day; Morelli was in the position to know, better than any other party, what was happening at the dock. Morelli undertook to raze the old warehouse building on the dock. Having torn down the structure, Morelli solicited bulk cargoes for the port for the first time, and specifically designated the area once occupied by the old building as the unloading area for those new cargoes. Morelli, therefore, was in a position at least to raise questions concerning

the dock's structural suitability for these purposes and also to take some precaution against a collapse of the dock. It did neither, and for this reason Morelli is negligent in the circumstances of this case.

60. Similarly, Morelli breached its duty to Atlantic Mutual by failing to exercise ordinary and reasonable care to preserve and protect the salt itself.

61. Morelli's negligence was a legal cause of the damages sustained by KAT and Atlantic Mutual.

62. KAT likewise breached its duty to Morelli by failing to exercise ordinary and reasonable care to preserve and protect its dock. KAT was the owner of the Kenosha harbor even though it did not run the port and was more like an absentee landlord. KAT also had some control over the uses to which its dock was put, although such control was not expressly exercised in its lease of the premises. Moreover, KAT was in a better position than any other party to determine, by searching its files for drawings and blueprints, the structural condition of the dock property it owned. Thus, KAT was in a position to uncover the risks of collapse and to protect itself against those risks. Like Morelli, KAT, as a matter of law, should have known of the dock's deteriorated condition. KAT, therefore, is contributorily negligent.

63. Similarly, KAT breached its duty to Atlantic Mutual by failing to exercise ordinary and reasonable care to preserve and protect the salt shipment.

64. KAT's negligence was a legal cause of the damages suffered by KAT itself and by Atlantic Mutual.

65. Neither Atlantic Mutual nor Morton is contributorily negligent in regard to the claims against Morelli and KAT for the lost salt.

66. In this case, the principles of tort law and, in particular, comparative negligence apply. The damage liability must be allocated in proportion to the relative fault of each tortfeasor. Because KAT's claim against Morelli is a pendent claim, Wisconsin's comparative negligence statute, Wis. Stat. § 895.045, will apply.

67. Under the facts and circumstances of this case, and with respect to all claims, Morelli is 60% negligent and KAT is 40% negligent.

68. An owner of property claiming damages in admiralty must minimize those damages; he may not recover damages incurred for betterment and thus improve his position as a result of the award. The owner has the burden of proof to show the reasonability of repairing a damaged thing of little value.

69. KAT has met this burden. KAT has not breached its duty to mitigate its damages. The restoration of a portion of KAT's dock facility does not constitute a betterment of the whole dock for which the defendants are entitled to a setoff.

70. Morelli is not under the legal obligation to indemnify KAT for any of KAT's damages under the lease agreement between KAT and Morelli. Morelli was required under the lease contract either to repair the dock at its own expense or to reimburse KAT with interest if KAT elected to make the repairs. KAT entered onto the premises to effectuate the repairs when Morelli failed to act. Undoubtedly fearful that Morelli would not pay, KAT had demanded that Morelli repair the dock or post bond to guarantee reimbursement to KAT. The lease did not require the lessee to post bond. Nevertheless, when Morelli neither repaired the dock nor posted a bond, KAT elected to terminate the lease for that reason. Having thus repudiated the lease, KAT is not now entitled to sue on the contract to enforce the indemnity provision. KAT's contract claim is dismissed.

71. SLT is not liable under its agreement with Morelli to indemnify either KAT as a third party beneficiary or Morelli.

72. Algoma, Morton, SLT, and Starline, therefore, are dismissed from the case.

73. KAT has incurred $723,670.10 in total damages. Morelli is liable to KAT for 60% of that sum, or $434,202.06.

74. Atlantic Mutual has incurred $102,789.04 in total damages. Morelli is liable to Atlantic Mutual for 60% of that sum, or $61,673.42. KAT is liable to Atlantic Mutual for 40% of that sum, or $41,115.62.

IT IS SO ORDERED.